May it please the court, Mack Jenkins on behalf of the appellant, the United States of America. Your honors, in the government's view, by putting oneself in the fast-moving chronology of how these related search warrants were obtained and executed, elucidates why, in our view, Detective Kaiser did what he did, but more importantly, why throughout the entire process, Detective Kaiser acted in good faith and with the objectively reasonable belief, in fact, the unequivocally correct belief, that there was probable cause to search what was then identified as defendant Underwood's confirmed residence. And we can see that the process that Detective Kaiser undertook was not perfect, but we are here simply because of one technical mistake. If Detective Kaiser had simply attached the federal affidavit, which he explicitly referenced in the first sentence of his narrative in the state affidavit, if he simply would have attached that federal affidavit to go with that reference in the state affidavit, we would not be here. Had he read the federal affidavit? The record doesn't make clear whether he had read it all, and we're not contending arguing that he knew every specific detail. What is in the record is that he attended the briefing, which talked about Underwood's role. Where did he get the, you know, there's portions of his affidavit that look like they come right from the federal affidavit. Yes, so. What's that? Would you like me to explain how? On one hand, it looks like he may have read it. On the other hand, I mean, it's an awfully lengthy affidavit. Correct. About 70 pages or something. The way it got to him, first, there was the briefing where it was discussed, and so he knew generally about Underwood's role in the long-term investigation. The state affidavit, the way it was drafted, is that the federal affiant was Special Agent Pete Johnson from the DEA. He wrote the 80-page federal warrant. While he was at the command center, and there's all multiple searches, 24 searches, 17 arrest warrants were being executed, Detective Kaiser had a location, and that's where they found Underwood's mom's residence, and they found out that he lived somewhere else. So Special Agent Johnson essentially emailed the relevant portions to Detective Kaiser to make up the state affidavit. So that's why portions of the state affidavit are taken from the federal affidavit, because those are the parts Special Agent Johnson sent to Detective Kaiser to include, along with the information of, this all comes from the federal affidavit that you executed. The idea being that he was to incorporate that federal affidavit and simply just summarize, instead of talking about, it was an 80-page affidavit for 17 targets. So obviously the state affidavit, just for John Underwood's residence, didn't need to be 80 pages long. So essentially what Detective Kaiser and Special Agent Johnson were trying to do was use that federal affidavit, but then focus the specific state affidavit simply to that one unit and that one target. And they were always to be read in combination with each other, but the state affidavit was narrowed, so they didn't have to rewrite an 80-page warrant. The mistake being that, although it was referenced in the very first sentence of the state affidavit, or the first sentence of the narrative of the state affidavit, Detective Kaiser did not physically attach that federal affidavit. Had he done so, the district court, in our view, concluded we would not be here. He said that the federal warrant had a wealth of information, supplied probable cause for all locations, including Underwood's residence. And so, in our view, this is not a situation where Detective Kaiser got caught doing something bad or overstepping his bounds or acting as a rogue officer. He made a mistake. And in our view, the Supreme Court's precedent and case law in those scenarios, specifically very recently in Millender, Messerschmitt v. Millender in 2012, Davis in 2012, and Herring in 2009, the point of the exclusionary rule they make very clear is deterrence. It's forward-looking. It's to prevent, not to repair, some mistake that was made. And they focus specifically on the level of misconduct by the officer. They've used the phrase rogue officers or level of culpability in determining whether or not good faith should apply. Here we submit that that scenario doesn't apply at all because there's no argument that Detective Kaiser acted rogue or that he had any other kind of misconduct. And so, in our view, the Supreme Court says in such scenarios, it's clearly established that suppression is clearly unwarranted because all that happened here was Detective Kaiser made a mistake. In fact, probably caused- Let me ask you a question, if you don't mind. Certainly. Here we have Steve Wilson, the district judge, whom I've known for a long, long, long time. He was head of a, as I recall, either major crimes or a fraud division, the U.S. Attorney's Office. So he's got some law enforcement genes that flow through his blood. And so here he has all of this. And he looks at it, and he's pretty upset about the way this was handled, wasn't he? Yes. And he finds a lot of fault with what went on. And he's there. He's overseeing this case. When it gets reversed, it'll go back to him. It seems to me like he did a very thorough job. And I could respond. I know there's a mistake made. There was no big hurry because the subject of this search was in custody, right? That's correct, Your Honor, but that was not the only impetus for being in a hurry. In a large-scale takedown like this is, essentially, half of the city's law enforcement is occupied by doing search warrants, by transporting arrestees to different locations, by conducting follow-up searches like this. It is an incredible burden on the law enforcement community and, as such, the safety of those members they're protecting to have all its agents occupied doing searches. Part of the hurry was not just for Defendant Underwood himself to be transported in his house search, but to continue with these searches throughout the city that day so everyone would be completed, transported to the facilities as required. So I do take that. And we also know that when you deal with these forces that involve the city, the state, the county, the federal government, different agencies, that there's a heightened risk of mistakes. Yes, and I do think what Judge Wilson— So you've got to be careful. Exactly. That is perfectly correct. And Judge Wilson made that clear. I think he actually headed up the Tax Department, but he was in the U.S. Attorney's Office, I'm well aware, and he did express— He did a lot of other things. Yes, Your Honor. And he did express displeasure with what he called the sloppiness, and I think that is a correct criticism. However, he also relied on Messerschmitt v. Lender, the then-en banc opinion of this Court, to—he relied on that heavily to find that the good faith didn't apply. The Supreme Court subsequently reversed that decision, and it's relevant here because of exactly the same scenario. It's not just about sloppiness. They use the phrase, isolated negligence doesn't warrant exclusion. The concern of my understanding from my reading of the Court's opinion here in Melender, before it was reversed, as well as the U.S. v. Grant, a recent opinion by this Court, where, again, you found that good faith should not apply, was when the agents were being very speculative or going on fishing expeditions or searching and stretching the search warrant application process beyond its use. And in those two cases, this Court found that, essentially, they were overreaching. And here, that's not at all the scenario. Certainly, there was sloppiness. Certainly, it could have done better. But this was not Detective Kaiser short-circuiting his duty or shirking his duty, and, in fact, probable cause did exist to search defendant Underwood's house. He just did not apply that. So the punishment here Well, who had the ultimate responsibility, the final responsibility, of presenting the warrant and the affidavit and all the underlying documents to Judge Wilson? To Judge Wilson or Judge Sandovig, who signed the state warrant? Well, whoever the judge. Yes. Judge Sandovig He's a state court judge. Correct. Superior state court judge. Judge Sandovig, that was Detective Kaiser. He presented it physically. He signed the warrant in Judge Sandovig's presence. Judge Sandovig did not ask any questions. He did not ask to read the warrant, the federal warrant. He said nothing. And that's He just rubber-stamped it. I don't think it That's the way they do it over there. You know Well, I don't Boo! I remember the first time when I was a municipal court judge. Very weak, you know, and knocking on my door. The bail bonds fund and somebody else. Oh, here it is. Just sign it, Judge. And whether that's the case or not, Your Honor It sure looks like that was the case here. He just stamped it. Except the case law is very clear that it's not the detective's duty to second-guess a decision. Oh, I know. That's another fiction in the law. But this Nonetheless, it is the law that Detective Kaiser could rely on at the time that he is not to second-guess unless clearly on its face. But Detective Kaiser, he was with the LAPD. He was with what's called L.A. Impact, which is a high-intensity narcotics task force throughout L.A. Yeah. But they pass these by the district attorney's office, don't they? Typically, they do. Here, this was during a federal task force investigation. I don't know if he had it reviewed by Superior. In this case, we don't know. That's not in the record. But what bolstered Detective Kaiser Well, he didn't say so in his Yeah, I don't I assume that he didn't. It looks like he just prepared this because I don't think anybody who any D.A. or any high-ranking officer would allow this kind of conclusory one-paragraph statement with no factual predicate in it to be submitted to a judge. I think it was I think that's fair that no one else reviewed it except for Special Agent Johnson and Detective Kaiser. However, I do think there is factual support in it. You think Johnson reviewed it before it was submitted to the state court judge? I don't know if he reviewed it. I knew they did it in conjunction. Special Agent Johnson sent the e-mail to Detective Kaiser. They worked together. I don't know if Special Agent Johnson reviewed finally what was sent. I know they were working together to prepare it. It's one paragraph. But in the next paragraph, there's additional information that provides factual support for those conclusions. So I do disagree that it's just one paragraph because the next paragraph talks about what investigation Special Agent Johnson undertook that supported those conclusions, namely that there was multiple wiretap phones. I believe four phones are listed. There were surveillances as part of that investigation. There was also seizures as part of that investigation. So I think while the clean lines And does he say that Underwood was involved and was the object of all of those seizures and No, he references He doesn't provide any facts. He references the investigation. It's, you know, this is, as Judge Wilson reflected, I mean, this is really, this is ridiculous. Was there some urgency in getting this search? Yes, Your Honor. It was in the middle. It was fast-paced in a hurry of a multiple county, multiple search warrant, multiple arrest tape down of numerous individuals throughout the city. Except Underwood was in custody. Yes. As to Underwood, there is no They had done a protective sweep of the house, which is when they saw the bag of marijuana. Correct. The baggie of marijuana. Yes, there was no They had secured the house. They had him in custody. Yes. And, you know, they could have waited overnight to search the place. They could have, Your Honor, except they were There was no rush. As to Underwood, well, there was concerns about little things like Underwood's dogs being present and where they were going to go. But my, the urgency was the investigation itself, not just as to Underwood. I don't argue that But we're dealing here with Underwood. We're blaming it on the dogs. There was, Mr. Ray did bring up a dog defense in his argument. There was some reference to his two dogs, but I'll leave that to Mr. Ray. I mean, all of this is sloppy. It doesn't necessarily mean the good faith defense wouldn't apply. That is ultimately our argument. We concede that it's sloppy. We're not, certainly not presenting this as a well-done search warrant by any means. Our argument is simply that it was a mistake and not a mistake under the Supreme Court's precedent. Do you read measures, you know, measures that arises in the context of the 1983 damage action? Yes. Against the individual officers? Yes. Do you think that the court's statement in there on qualified immunity are a little bit different? Place that case in a little bit of a different context than a motion to suppress evidence? I do not. I think the case law in the Supreme Court makes them parallel. I think they said there's no distinction. So, you know, we have case law that says when you look at a claim of good faith, you need to look at the four corners of the affidavit and whatnot. You can't consider extraneous matters in determining the objective reasonableness of an officer. Do you think Measuresmith overrules those cases? I do. I think it makes clear, and that was the other distinction from Judge Wilson's opinion that we were trying to identify in our briefs, that Judge Wilson says you can't consider any of these other factors outside the four corners, including that there's a federal affidavit applying to the same person. Measuresmith says, yes, you can. The fact that that warrant, which was very far-reaching in what it was looking for, one of the reasons the Supreme Court held good faith applied was because he sent it to a superior, and he sent it to a DA to review, and it explicitly said those things can be considered in a determination of good faith. Even though they weren't part of the affidavit? Even though they were not part of the affidavit. And I think that does, Measuresmith does in that way overrule some cases and some circuits who hold to the contrary. And I think that's directly applicable here because one of Detective Kaiser, in fact, perhaps his only saving grace, is that he knew about that federal search warrant of Underwood's other residents. He was part of it. And had he, in his mind, he was thinking all I'm doing now is essentially I have two warrants for the same person, and it's even better at this point because now I know where Underwood actually lives. I have a federal warrant, search warrant, arrest warrant for him signed by a federal judge. I'm great. The only question is that we're not sure where he lives. They find out where he exactly lives. The first time they went to his mother's house. Correct. Thinking that he lived there. They didn't really check out where he lived? They did. Was he? Sorry. The car that was viewed in the transaction with the crates, the registration was to that address. That car was also observed during surveillance multiple times. He clearly went to his mom's house, and it was registered, so that was the only location they knew of. Did they spend the night there? It's unclear, but that is. No, usually surveillance, huh? Yeah, they did surveillance. From home? Yes. It's not 24 hours a day, seven days a week. They did do surveillance that corroborated what the registration stated. In addition, they didn't have any other information. So that's why my point there was essentially that that was the one questionably a weak point in that federal affidavit. They didn't know that he had another place? They did not. It wasn't until the mom told them about this other location that they found out about that location. Detective Kaiser acted promptly to seek a search warrant. In his mind, now, bingo, we have everything. We have the probable cause, and we know exactly where he lives because we just talked to him there. And in our view, that demonstrates good faith repeatedly, and looking outside the four corners as Messerschmitt allows, we can establish that this is a case where it's not a road office. How many search warrants, how many homes were searched? There was 17 arrest warrants. There was a total of 24 searches. Ten of those were either residences or stash houses. The other 14 were vehicles. And I see that I'm over my time, but I'm happy to continue answering questions. Any questions?  Thank you, Your Honor. Good morning. May it please the Court. Donald Ray representing the defendant, Appellee, in this matter. I haven't seen you for a while. It has been a while, and it is a pleasure to see you again, Your Honor. Good to see you. I hope you're doing well. I'm an old, gray-haired man. You know, somebody said to me the other day, and I walked into court, Mr. Ray, we're getting old, and I said, getting doesn't apply to us anymore. May it please the Court. I have great respect for Mr. Jenkins, but I have to disagree with virtually everything he has said. He talks about this as being one technical mistake. This isn't a technical mistake. This is a warrant that has absolutely no probable cause displayed in it. I don't think the government even disagrees with the fact that the warrant is bad. Their contention is that somehow this is saved under the notion of Leon good faith, and they base that primarily upon a declaration that was submitted by the affiant to Judge Wilson during the course of the proceedings in which he indicated that he believed that the probable cause from the federal warrant somehow, quote, carried over to his warrant. Now, in essence, what they're saying is that good faith is demonstrated by an affiant who says that statements made by another affiant in a different affidavit, in a different warrant, submitted to a different court, in a different jurisdiction, regarding a different premises, a week before, somehow carried over, he believed, to his affidavit. That is probably one of the most outlandish statements I've ever heard in the area of Fourth Amendment jurisprudence. And the question then becomes, why do they say this? And the Court touched on this in some of the questions. They look at Messerschmitt and they say, well, Messerschmitt somehow changed the rule to allow the consideration of extrinsic evidence. Well, yes, it did, but it allowed extrinsic evidence to be considered not with regard to supplementing probable cause, but simply to find out what the agent did who made the act, what the affiant did, to determine whether he acted in good faith. And in that case, the affiant went through a whole slew of activity, including getting approvals from two of his superiors, from a district attorney, from all kinds of people. He also went through an enormous investigation, apparently, as they detailed it in the case, which demonstrated that there was conduct which the Court could consider about the affiant which justified a finding of good faith. So let me ask, one of the things that Judge Wilson said in his, one of his orders, I forget, or in his order, I think it was. He said, what if he just attached a copy of the Federal Search Warrant to the state affidavit? We wouldn't be here today. Well, I think the truth of the matter is, if somebody had filled out an affidavit that included probable cause, we wouldn't be here today. And that is what the judge is presumably saying, that had they included the Federal Search Warrant. But they didn't. We have a magistrate who issued a search warrant, and the standard is still the same. So you have an officer who, you know, he's been involved in this investigation, I guess, to some extent. He knew that they had, he at least knew that they had been to the other residence. Yes, I think the evidence is he was brought in that day basically to help him carry out the warrant. He knew that they had been to the other residence. He spoke, apparently, to the investigating officer or the agent with regard to that investigation, received some information from him, some of which he copied, but not the factual basis, and then delivered it to a state judge. Right. So why couldn't he, why couldn't an officer in that situation just reasonably, objectively, when you look at it, think that there's probable cause? I mean, there is a basis here for what the magistrate judge did. But the issue that we focus on when we look at a warrant is, and it's still the same after Messerschmitt came down, was there a situation where the magistrate obviously erred in issuing that warrant? That's one of the standards they used. There's no doubt that this magistrate, this State magistrate, obviously erred. There is no doubt that any police officer, I don't care whether he's well trained or not, would know that that magistrate obviously erred. You cannot have good faith when you have an agent, regardless of what he has in his head about what he thinks is going on in an investigation, is relying upon a Fourth Amendment document, that search warrant, when it's clear on the face of that warrant that that warrant should not have issued. We can't get into a situation where we say, you know something, if you did it differently, if you conducted a different investigation, if you put in other facts, if you did all this other stuff, well, great, then we'd have probable cause and we wouldn't have an issue, and that somehow that's good faith. You can't take this agent and, you know, understand something here. He filed a declaration under penalty of perjury with this Court saying, I believe that the probable cause carried over. Where on earth did that come from? We never got to cross-examine him because it never got that far. But that is one of the most absurd things I've ever seen from a declaration from a State law enforcement officer, that somehow mystically probable cause carries over. That's not good faith. What is good faith is shown in the two cases that counsel was talking about, Messerschmidt and Grant. In Messerschmidt, we had all of this conduct, all of this investigation, checking with his superiors. None of that was done here. In Grant, they still found that Leon didn't apply, but they described in detail the extensive investigation that was done in that murder case to locate a telephone, trace it to two individuals, show that those individuals had used the phone, show that they had access to a gun, show that they had contact with the defendant, show that the defendant's house in Adelanto was someplace that one of them had visited. There was a huge degree of investigation. That wasn't a bare-bones affidavit. And the Court still came to the conclusion, based upon the language in Messerschmidt, still came to the conclusion that there is no good faith despite all of that. Well, you know, you are very understandably committed to the defense of your client, but this exclusionary rule has always been an object of some criticism. If you go back to Justice Cardozo when he was on the New York Court of Appeals, there's a famous statement from him, because the constable has bonded the criminal escapes. Correct. You know, it's not a rule that one can look at with any enthusiasm, and you heard the counsel, I think, say the rule is not meant as a remedy, but as a deterrent for future behavior. Now, if you look at it that way, how would you see the purpose of the rule? Well, the rule's been around, I may be old, but the rule's been around as long as I've been a lawyer. I know, it's survived, it's survived. It's survived, and it is there, and it is the law, and here is the problem. What counsel was saying, I think, and what the Court is referring to. I think the purpose of the rule, and this is what I learned at Boalt Hall, where Judge Noonan taught for many years, but not good law, and that was that the purpose of these laws, or a very significant purpose of these laws, is to maintain high standards of professionalism among law enforcement. You see, these are not rules that are anti-law enforcement. These are rules that require law enforcement to maintain a higher standard. I agree with the Court. And Miranda does that, and the exclusionary rule does that. The harmless error cuts the other way, and the system becomes sloppy, where you can just hand someone a piece of paper, and, okay, here it is. And that's not maintaining a very high standard. And then so much happens when there's a great need for a warrant, where, in many cases, the prosecutor will show up at your office. The law enforcement agency will show up, and it's like a self-created emergency. If you don't look at this, sign it, be quick about it, everything's going to collapse. So that's the way sometimes the system works. It probably goes that way quite often. That's probably why Judge Wilson, who is a very tough guy, took some umbrage at what was handed. I mean, he just, he maintains, he's a guy that maintains very high standards when he was a prosecutor. And so that's the purpose of these rules. I agree with Your Honor, and to follow up. Well, I'm sure you agree with me. Why wouldn't you? Well, but to follow up with Judge Noonan, who may not. Mr. Grant, I would be interested in hearing your response to Judge Noonan's question. Yes, because I think what Judge Noonan, I think what you're referring to was some of the comments that were made by the, that related to comments made by the government with regard to rogue officers and that kind of thing. That's not what we're dealing with in the application of the good faith rule. They don't only say it has to be a rogue officer. And two of the primary cases are Messerschmitt and Grant. Those officers did everything that they could. They investigated. They did long investigations. They put all the information in front of the judge. One of them checked with three superiors. The other put in long, detailed analysis of what he had did and prepared two affidavits. Those officers never would be regarded as rogue. They weren't being regarded as somebody who did something wrong or mean or improper in terms of being illegal. They were people who messed up. And what happened is they messed up on the issue of probable cause. And so when you look at the language that the Court comes down with in Grant, they're saying, you know what, first of all, Messerschmitt didn't deal with probable cause. So that deals with the extrinsic evidence applies to probable cause issue. But then they said, here we have a situation where the issue is, was there probable cause to search that house at all? And what they concluded is there was not. And they could have said, I suppose, you know what, but the officer was a good guy and he worked hard and he put together a whole case. They didn't say that. What they said was this officer should have known there was not probable cause, because there was no culpable argument for probable cause in that warrant. Now, in this case, that standard is the same standard. And by the way, that standard comes from Messerschmitt. And that also is the standard that was in the Ninth Circuit version of Messerschmitt before it was reversed. That's all Judge Wilson was talking about. There's no culpable argument for probable cause in the warrant. The purpose of that is to say these law enforcement officers have to go out and at least do due diligence to know that there is some colorable claim of probable cause in the warrant that they're using. Because remember, whether we like the exclusionary rule or not, it's part of Fourth Amendment law, and that Fourth Amendment requires a warrant for the search of a residence. So respectfully, I think what we're in is a situation where we may want to say, gee, too bad they're working hard or too bad they had to take down so many people or too bad, but despite that, they are required to do their due diligence to make sure at least that there is a colorable argument for probable cause in that warrant. Do you think Judge Wilson would have reached the same decision in light of the Supreme Court's decision in Messerschmitt? Absolutely. Because the only thing that he looked at in the lower court case was actually that language that he was talking about. Well, he also was concerned about the extraneous evidence that the government was trying to put in. He said, I really can't consider that. Well, the extraneous evidence is interesting because I think counsel is applying it to the wrong issue. The extraneous evidence went to the fact that the court could look and say, all right, here's a detective who went out and went to his superiors. That's obviously not in the warrant. He checked with a district attorney. That's not within a warrant. He did a big background investigation on the individual in question. That's not in the warrant. What they're saying is we will look to extraneous evidence to decide if the conduct of that particular refiant was such that we can say the mistake he made was an honest mistake, and so we're going to go ahead and we're going to say it's all right. There's none of that here. This refiant didn't check with anybody. The court asked the question, did he check with a supervisor? They had the opportunity to say that. He never said anything of the kind. And I think that the way the record stands with regard to the Federal agent was simply the Federal agent called him and said, you know, go to that house, go get a warrant for that house, and sent him a copy of something, which this agent copied as if it were his own. They're trying to say he was talking about wiretap interceptions as T1, T7. He doesn't even know what he's talking about there. He clearly wasn't involved with the case at that time. He just cut and pasted something, threw it together, went to a judge who rubber stamped it, and we're going to say, okay, you know what, officer, you were busy that day, so we're going to let you get away with this. We're going to have somebody's house searched so that they can do that in the future. Respectfully, I don't think that that's what the Fourth Amendment requires. I'm certain that's not what the exclusionary rule requires, and it's not what Messerschmitt and Grant require. The cases are uniform with regard to how you're supposed to apply that principle of Leon to a situation like this, and this doesn't even come close, respectfully, to what is required. Now, there are other issues in this case regarding staleness. I think that they're properly briefed. I think that actually Judge Wilson did an extraordinary job analyzing all of the cases regarding staleness everywhere, and so I would rather have submitted his memorandum than my brief, so I ask the Court to take this matter under submission, rule in our favor, and consider everything that was said by Judge Wilson. Thank you very much. All right. Fine. Thank you. Your Honors, I've exceeded my time, but I'll just respond briefly if you would like. What did you say? I believe I have exceeded my time from last. What, you want to say something? Yes, Your Honor, just briefly. Just on the points of the outlandish claim that Detective Kaiser put in his affidavit that he felt the probable cause from the federal search warrant carried over to the state warrant. That's effectively what he says, Detective Kaiser, in his affidavit. That he submitted to Judge Wilson. The declaration, yes. Right. And he also says essentially that when I went to Judge Sandovig, the state judge, in my mind, this being Detective Kaiser, probable cause was even more enhanced because now I knew where he actually lived. So it carried over, and now I had extra probable cause. So that's my subjective belief, being Detective Kaiser, when I went to Judge Sandovig. And Mr. Wray calls it outlandish and mystical, but Judge Wilson never said that he thought that Detective Kaiser was lying. He never takes issue with the credibility of those statements going through Detective Kaiser's mind. He says you were wrong, or you should have known better, that that didn't apply. But what's important also is that when he goes to Judge Sandovig, if those outlandish claims and mystical claims are so outlandish and mystical, it is Judge Sandovig's ability and duty to say, where's the warrant? I want to see the warrant. Ask any questions, some specific questions. But clearly then it couldn't be that outlandish or that mystical if Judge Sandovig looked at it, saw the first sentence, and I do think that first sentence is weighty because when Judge Sandovig sees that Victor Kenton, the magistrate judge, has signed a probable cause warrant for the same person, he is allowed to give that deference. It's just as if a reviewing court sees a search warrant. If it's a magistrate judge, it's challenged. It goes to the district court judge. The district court judge has to give the magistrate's determination of probable cause great deference. That is the case law. It's well established. So in an analogous situation, Judge Sandovig sees that Judge Victor Kenton, federal magistrate judge, issued a federal warrant for the same individual. Clearly he's allowed to give that deference. And it is in that context that the rest of the facts, overly conclusory we admit, but we do submit that there are additional facts. But it is in that context that Judge Sandovig reads the warrant. And in addition, more importantly, it's in that context that Detective Kaiser presents the warrant and executes it. And just a few points on Messerschmitt. Messerschmitt definitely changes Judge Wilson's view because he said, don't consider all of these other extrinsic factors. He says the federal warrant is irrelevant. Our position is the federal warrant is everything because it's everything Detective Kaiser relied on for his good faith. If he was allowed to rely on that as an extrinsic factor and if Judge Wilson considered that, I think he would have a different view. And whether or not he went to a supervisor or went to a DA, he went to a federal magistrate judge. He had a warrant for John Underwood signed by a federal magistrate judge. So if in Messerschmitt what carries the day is that he went to a DA who's part of the prosecution team or his supervisor who's not even trained in the law, Detective Kaiser has a federal warrant from a judge, then gets a second warrant from a state judge. He has two warrants that both say defendant Underwood, there's probable cause to search his house wherever he lives. Detective Kaiser had every ability and every intention of executing those warrants. And in fact, and this is where Grant is different, Mr. Ray relied on, probable cause did exist. It's unequivocal at this point, unquestioned. In Grant, the problem was probable cause did not exist. Outside the warrant, inside the warrant, nowhere. Here there was probable cause to search defendant Underwood's home and Detective Kaiser properly executed it. There would be a high substantial cost in excluding it. 33 kilos of cocaine, $417,000, over 100 pills of ecstasy. It's not a small cost. It may allow the guilty person to go free, which is what the Supreme Court has warned about. And I would submit on that, Your Honors. Thank you for the additional time. Thank you. Thank you.
judges: Pregerson, Noonan, Paez